**SO ORDERED.**
**SIGNED this 5th day of October, 2012**

_____
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:

WYNNA MOSES WILLIAMS,                    No. 12-11397
                                          Chapter 13
        Debtor.

## MEMORANDUM

Appearances:    Kenneth C. Rannick, Kenneth C. Rannick, P.C., Chattanooga, Tennessee, Attorney for Debtor

Thomas L. N. Knight, Grisham, Knight, and Hooper, Chattanooga, Attorney for First Tennessee Bank, N.A.

Honorable Shelley D. Rucker
United States Bankruptcy Judge

The court has before it the objection of First Tennessee Bank, N.A. (the "Bank") to the debtor's chapter 13 plan. The debtor granted a security interest to the Bank in her residence; nevertheless, the plan proposes to treat the Bank's claim as unsecured. The debtor contends

1

that she may treat the Bank's claim that way because the Bank's claim is wholly unsecured. The debtor contends the value of the residence does not exceed the sum of the first lien and the real estate taxes. At an evidentiary hearing held on September 6, 2012, both sides presented expert testimony regarding the value of the residence. Based on the evidence presented the court finds that the residence has value in excess of the sum of the first lien and the real estate taxes. Consequently, the Bank's objection is sustained.

In support of its ruling the court makes the following findings of fact and conclusions of law. This court has jurisdiction to hear and determine this contested matter under 28 U.S.C. § 1334 and § 157(b)(2)(L).

*Stipulated Facts*

For purposes of the hearing, the parties stipulated to the following facts. The debtor filed for relief under Chapter 13 on March 19, 2012. The debtor owns a home located at 8723 Hidden Branches Road, Harrison, Tennessee. The Bank holds a second in priority deed of trust on the residence to secure a claim of $25,231.84. Nationstar Mortgage, LLC as servicer for First Horizon Home Loans, a division of First Tennessee Bank, N.A., holds a first in priority deed of trust on the residence to secure an obligation of $60,303.38 and an arrearage of $2014.06. The deeds of trust for the first and second liens each secure a separate obligation. Both lenders have filed claims representing that these are the amounts owed. County taxes and storm water taxes have accrued on the property in the amount of $937.42.

*Treatment of a Wholly Unsecured Mortgage Claim*

The debtor has proposed a plan which treats the Bank's claim secured by a second lien as an unsecured claim. Ordinarily, a claim secured by only a personal residence could not be modified by the debtor. 11 U.S.C. § 1322(b)(2). However, that limitation applies only to "holders of secured claims." *Id.* The debtor contends her residence is not worth more than $63,254.86, the sum of the principal balance of the first mortgage, the first mortgage arrearage, and the accrued taxes. Therefore, she contends that the second in priority lien has

2

no value and that the Bank is not a "holder of a secured claim."

In support of her position, she relies on the applicable law in the Sixth Circuit set forth in the case of *Lane v. Western Interstate Bancorp (In re Lane),* 280 F.3d 663 (6th Cir. 2002). *Lane* states, "[w]here a creditor holds a second mortgage on a homestead valued at less than the debtor's secured obligation to a first mortgagee, . . . the holder of the second mortgage has only an 'unsecured claim' for § 506(a) purposes." *Id.* at 664. If the lien has no value, the claimant holds an unsecured claim and the claimant's contractual rights are subject to modification under § 1322(b)(2) of the Bankruptcy Code. *Id.* at 669. The Bank does not dispute that this is the applicable law; but it does dispute that the value of the house is less than the sum of the outstanding balance of the first mortgage and the real estate taxes. As the proponent of the plan, the debtor has the burden of proving the conditions for confirmation in §§ 1322 and 1325. Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy*, § 217.1 at ¶1 (4th ed. 2004), and cases cited therein. Therefore, with respect to the confirmation issue raised in this case, the debtor has the burden of proving that the value of the residence does not exceed the sum of the first mortgage and the real estate taxes.

*Standards for Valuation Analysis*

Based on the stipulated facts, the court must determine the value of the residence.

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest…is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property….Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing…on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1). The valuation in this matter is made in conjunction with the confirmation of the debtor's chapter 13 plan. The collateral that the court is valuing is her residence which she intends to continue using as her residence. Both of these facts are important to the court's determination of the valuation standard and the timing of the valuation.

3

> In general, the courts agree that the standard is one of fair market value. By itself, however, this reveals relatively little. In virtually every case, the determination of fair market value will depend on the particular market and means selected to gauge the value of the item in question….
>
> The question becomes which market and means establish the most appropriate benchmarks for bankruptcy purposes. As section 506(a) instructs, the answer depends in the first instance on (i) the purpose of the valuation, and (ii) the proposed disposition of the collateral. By themselves, however, these directives leave a number of important questions unanswered.

4 *Collier on Bankruptcy* § 506.03[6](Alan N. Resnick & Henry J. Sommer 16th ed. 2012)(footnotes omitted). In this case both appraisers expressed that they were providing a fair market valuation. Both used a definition of market value that states:

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her best interest; (3) a reasonable time is allowed for exposure in the open market;(4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal considerations for the property sold unaffected by special or creative financing or sale concessions granted by anyone associated with the sale.

Exhibit 1, Ramirez Uniform Residential Appraisal Report, p.4; Exhibit 2, Haisten Uniform Residential Appraisal Report, p.4.

As to the relevant fair market valuation, the court must determine whether the correct standard is foreclosure value, replacement value or some other standard. Where the debtor intends to continue using personalty securing a claim, the Supreme Court has held that "[a]pplying a foreclosure –value standard when the cram down option is invoked attributes no significance to the different consequences of the debtor's choice to surrender the property or retain it." *Assoc. Commercial Corp. v. Rash*, 520 U.S. 953, 962, 117 S.Ct. 1879, 1885, 138 L.Ed 2d 148, 158 (1997). Although a specific standard for personal property securing an allowed claim was incorporated into section 506(a)(2) with the amendments made in 2005 by the Bankruptcy Abuse Prevention and Consumer Protection Act, the standard was not clarified for

4

real property. If a debtor intends to keep his residence, some courts hold that the residence should be valued at its fair market valued derived by comparing similar arm's length transactions rather than foreclosures sales. *In re Strever*, 468 B.R. 776, 780 (Bankr. D. S.C. 2012)(citing *In re Balaoing,* No. 11-52030-ASW, 2011 WL 5885784, at *4 (Bankr. N. D. Cal. Nov. 22, 2011)(proper valuation is fair market value which is not "replacement" value because house is not being replaced nor is it foreclosure value because no foreclosure is intended in the chapter 13 plan); *In re Duncan*, No. 08-8808AJM3, 2008 WL 5333561, at *2 (Bankr. S. D. Ind. Dec. 17, 2008)(court finds that three comparable sales proposed by debtors were not indicative of "fair market value" because they were distressed sales of bank owned properties that were foreclosures rather than arm's length transactions, and therefore not substantially similar to debtors' residence).

Given no specific clarification for the valuation standard for real property and the broad language of *Rash*, the court finds that a standard of comparable arm's length sales is appropriate. It reflects whatever premium the debtor assigned to the property which prompted the debtor's decision to continue using the property rather than surrendering it. The court is also persuaded by the reasoning in *In re Strever* that the comparable arm's length standard does not ignore the reality of a market which includes a significant number of distressed real estate sales which include trustee sales, sales of bank owned properties, and short sales.[1]

> The presence of distressed sale properties on the market, particularly a high volume of them, affects the value of all properties competing for sales. Their presence is likely to lower the asking price for properties being sold in arm's length transactions. Nonetheless, a seller of a foreclosed home is still likely to be motivated to sell for a lower price than a sale between two willing individuals in an arm's length transaction. Additionally § 506(a)(1) directs the Court to not rely on foreclosures for valuation when a debtor intends to keep his or her principal residence. Comparing the sales of similar homes sold in arm's length transactions between two individuals, adjusted for the material differences from the property being appraised, is the proper way [to] determine a property's market value for the purposes of § 506(a)(1) and § 1322(b)(2).

---

[1] *See In re Strever,* 468 B.R. 776, 778 n.2 (Bankr. D. S.C. 2012).

*In re Strever*, 468 B.R. at 782. Use of only distressed sales unduly lowers the value. Their use as comparable sales requires the appraiser to consider a foreclosing lender and its debtor as being "typically motivated" buyers and sellers, and the trustee sale itself as one not "affected by undue stimulus" in order for such sales to be considered comparable "fair market" sales under the definition used by the appraisers in this case. Even if the sale is by a lender which has held the property on its books as "Real Estate Owned," there may be considerations imposed by regulatory authorities other than simply obtaining the best price or limitations on the time available for marketing. For these reasons the court finds that comparable arm's length sales constitute the appropriate standard for the determination of fair market value for residential real estate which the debtor intends to retain.

    *Timing of Valuation*

    With respect to the timing of the valuation, the date of the confirmation hearing generally is the operative date for valuation of real property in the context of a chapter 11 case. 3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice*, § 52:8 (3d ed. 2012). Valuation of real property in the context of a chapter 13 case is less clear. The debtor argued that the date of the petition is the appropriate date for valuation, and there are courts that agree. *See, e.g., Moore v. Delta Community Credit Union (In re Moore)*, No. 11-12190-WHD, Adv. No. 11-01051, 2012 WL 2870710, at *1 (Bankr. N. D. Ga. May 14, 2012)(citing *In re Flores*, 2012 WL 124973 (Bankr. N. D. Cal. 2012)(citing *In re Serda*, 395 B.R. 450 (Bankr. E. D. Cal. 2008)); *In re Sarno*, 463 B.R. 264 (Bankr. D. Mass. 2011); and *Johnson v. GMAC (In re Johnson)*, 165 B.R. 524 (Bankr. S. D. Ga. 1994). Because of the short time between filing and confirmation in the context of a Chapter 13 plan, the Fifth Circuit Court of Appeals has also declared that the filing date is the appropriate date for valuation. *Chase Manhattan Bank USA NA v. Stembridge (In re Stembridge)*, 394 F. 3d 383 (5th Cir. 2003). *But see In re Landry*, 462 B.R. 317 (Bankr. D. Mass. 2011)(effective date of plan is valuation date). The Sixth Circuit has not ruled on this point.

The court finds the argument favoring the date of confirmation more persuasive. The court agrees with analysis of the issue in the *Landry* court.  In his opinion, Judge Boruff outlined three reasons why valuation of real estate should be as of the effective date of the chapter 13 plan for § 1322(b)(2) purposes.  First, "context almost always informs the question of valuation." *Landry*, 462 B.R. at 321.  For example, when valuing collateral pursuant to a motion for relief from the automatic stay of 11 U.S.C. § 362(d)(1), the court examines the ongoing impact of the stay on the liquidation value of the collateral.  If, however, a debtor opts to retain an asset pursuant to a plan of reorganization, ". . . the debtor [is] held accountable for the asset's fair market or some variant of going concern or replacement value." *Id.*  Second, § 1325 "evidences a congressional intention that valuations relative to plan confirmation be conducted in the context of the present, rather than the past." *Id*. at 322.  The *Landry* court highlights 11 U.S.C. § 1325(a)(5)(B)(II)(ii) and observes that where a debtor has not obtained the secured party's consent or surrendered the property, confirmation is obtained by ensuring proper valuation "as of the effective date of the plan." *Id.*  Third, valuation in chapter 13 cases should be no different than analogous determinations under Chapter 11 cases to maintain consistency in statutory interpretation.  *Id.* at 322-23.

In this case, the court finds that this valuation is being made in the context of the confirmation of the plan, and that, absent specific congressional direction to the contrary, the appropriate timing for the valuation is the date of confirmation.  Also, the timing of this case is more like a chapter 11 since approximately six months have passed since the filing date. Finally, the court notes that the two appraisals were both prepared postpetition and both appraisers considered sales made after the petition was filed.

*Comparison of Appraisals*

At the hearing on the Bank's objection to the debtor's plan, an appraiser for each party qualified as an expert for valuing residential properties and gave an opinion as to the value of the debtor's property.  Both were experienced. Their written appraisals evidenced a thorough

7

consideration of the property and review of the market. The debtor's expert, Mr. Ramirez, testified that the residence was worth $47,000. The Bank's expert, Mr. Haisten, testified that the residence was worth $102,000. Both used the sales and cost approaches in their appraisals. However, based upon their testimonies at the hearing, neither appraiser seemed to rely upon the cost approach in reaching their conclusions.

With respect to their sales approach analyses, they had several significant differences. First they differed on the current condition of the residence. Mr. Ramirez characterized the condition as "fair" while Mr. Haisten believed the property to be in "average" condition. Both acknowledged that there were deferred maintenance issues with the house although Mr. Ramirez highlighted those conditions to a much greater extent than did Mr. Haisten. Mr. Ramirez viewed those maintenance issues to be so significant that he considered only distressed properties to be comparable for his appraisal. His appraisal reviewed six comparable sales. Five of the six were sales by lenders during the period from November 2011 to April 2012. These were properties that had been purchased by the lenders at foreclosure sales and were being resold. The sixth sale was a property sold by an individual who had been renting the property and who was selling the property "as is" after it had been vandalized by the last tenants. Five of the six sales were cash sales.

The court notes that Mr. Ramirez did not use the sale prices that were paid at the foreclosure but rather the resale value obtained by the foreclosing lender. The Bank argued that these comparable sales should be given little weight since they were of properties that had been foreclosed and reflected properties in distressed condition. Mr. Ramirez justified his selection by explaining that he believed the debtor's property was in the same condition.

The Bank's appraiser selected his comparable sales from the other end of the spectrum . None of his six sale selections were sales by lenders following foreclosures. He testified that he did not include foreclosure sales since he did not believe those sales reflected fair market sales. He did, however, include one sale of a home that had been purchased at a

8

foreclosure, substantially remodeled and then resold by the purchasers. His comparable sales also required greater adjustments than Mr. Ramirez's comparable sales. All of the comparable sales had finished basements which required adjustments of $8000 to $11,000 in the sales prices. Three of the houses were rated in good condition which required an adjustment of $5000. Even with these adjustments, his comparable sales ranged from $90,070 to $116,309. Mr. Haisten's sales dates ranged from June of 2011 to July of 2012. One had been only a listing in his original appraisal. The court recognizes that use of a listing should be as suspect as foreclosure sale values in determining fair market value. "Just as it is difficult to adjust foreclosure sales upward, it is also difficult to gauge how much lower than a listing price a given home will sell for." *In re Strever*, 468 B.R. 776, 781-82. However, in this case, Mr. Haisten updated the appraisal to reflect that the property listed for sale had actually sold in July for an adjusted price of $116,646. In addition to this recent sale, the court finds Mr. Haisten's comparable sales were closer in proximity to the debtor's home and were closer in age. One sale was in the same neighborhood.

Both appraisers acknowledged that the best comparables would be sales within the past six months of homes of similar size, age, condition, and quality, located within a mile of the subject property. While both could find homes of comparable size, their selections contain a wide variety of ages and quality. The sales were over the past twelve months, not six, and within five miles, not one, of the subject property.

The appraisers leave the court to determine at which end of the spectrum the debtor's property falls. In reviewing the photographs attached to the appraisals, the court notes that there appears to be a water problem in the unfinished basement. How large a problem it is cannot be determined from the proof. Neither appraiser was a contractor or home inspector. The testimony was that neither saw standing water. The debtor testified that she had had standing water in her basement on occasion. The deck was also in need of repairs; however, the debtor continues to use the deck. The debtor appears to be taking care of the home and is

repainting the interior which may explain missing light fixtures and electrical plates noted in Mr. Ramirez's appraisal. The home is 27 years old, and the photographs show that it has been lived in, but not abused.

The debtor proposes to continue residing in the home. By limiting his comparable sales to foreclosed properties, the court finds that Mr. Ramirez's market selection is more appropriate for valuation of a surrendered property rather than a retained or even replaced property. The one arm's length sale in Mr. Ramirez's comparables was for a house that was older and had been vandalized. (Exhibit 1, Uniform Residential Appraisal Report, p.2, Sale No. 3.) The adjusted value was $59,350; but, as an arm's length sale, it was $12,000 more than his appraised value. Mr. Haisten's appraisal includes a $116,200 sale on the same date of a similarly-sized home that is 11 years older than the debtor's, in average condition with a deck and a partially finished basement. This home is the same distance from the debtor's as Mr. Ramirez's Sale No. 3. After adjusting for the differences, the value of that home was $99,885. (Exhibit 2, Uniform Residential Appraisal Report, p. 7, Sale No. 4.) Another of Mr. Haisten's comparable sales was a house which closed in July and is located on the same street as the debtor's residence. It had an adjusted value of $116,646. (Exhibit 2, Uniform Residential Appraisal Report, p. 7, Sale No. 6.)

*Conclusion*

The court finds that the value of the house is substantially closer to Mr. Haisten's value than Mr. Ramirez's. Based on the valuation standard selected by the court and the date for determining the valuation, the court finds Mr. Haisten's appraisal more persuasive. It reflects arm's length transactions closer to the date of the confirmation hearing. The court finds that the value of the house exceeds $63,254.86. The debtor may not treat the Bank's claim as unsecured. The Bank's objection will be sustained. The debtor will have ten days to amend her plan in compliance with the court's order or to convert or dismiss the case.

A separate order will enter.

# # #

# # #